Robert GARVEY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 5, 2004.

Supreme Court of Delaware.

Submitted: Jan. 12, 2005.

Decided: April 28, 2005.

Jennifer–Kate Aaronson of Potter Carmine Leonard & Aaronson, Wilmington, Delaware, and Jan A.T. van Amerongen (argued) of Wilmington, Delaware, for appellant.

John Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

STEELE, Chief Justice.

Robert Garvey appeals his conviction of first-degree murder and other felonies in the Superior Court, claiming that the trial judge abused his discretion by denying a pretrial motion to suppress Garvey's post-arrest statement and a motion to declare a mistrial. Garvey also contends for the first time on appeal that the jury's findings at the guilt and penalty stages were inconsistent. We find that the trial judge acted within his discretion by denying Garvey's suppression and mistrial motions. Furthermore, because the sentencing recommendation of life in prison was the product of jury lenity and the verdict is otherwise supported by the record evidence, we find no plain error in the jury's findings. Accordingly, we affirm.

## I.

On the afternoon of July 14, 2001, Turquoise Williams and Benjamin Finnell traveled to a Wilmington shopping center looking for clothes to wear at the City's annual Greek Festival. While there, they met two women, Rebecca King and Tracey Vanderworker. The four spoke and agreed to meet later that night. King and Vanderworker then left and approached Garvey and two others, Donial Fayson and Leonard Manlove. In search of money, the five agreed to rob Williams and Finnell later that night. According to their plan, the two women would lead Williams and Finnell to a Wilmington apartment complex, where Garvey would be waiting to rob them.

In the early hours of July 15, Garvey, armed with a handgun, traveled to the apartment building. Meanwhile, King and Vanderworker picked up Williams, Finnell, and Donald Jordan, and drove them to the apartment complex. When they arrived, however, the three men were reluctant to leave the vehicle. Eventually, King and Vanderworker persuaded them to go inside the apartment building. Once they got out of the car, Garvey approached Williams. Williams resisted, and Garvey fired a shot. Although the shot missed Williams, it struck and killed Jordan. Along with the other four, Wilmington police later arrested Garvey and charged him with first-degree murder, first-degree robbery, and a variety of firearms and other offenses.

Later that morning, the arresting officers brought Garvey to the police station. Once there, investigators sought a statement. After advising Garvey of his constitutional rights, Wilmington Police Detective Andrew Brock asked Garvey whether he wished to waive his right not to incriminate himself and answer the investigators' questions.

Q. [U]nderstanding those rights are you willing to give a statement if I ask you certain questions?

A. Depends on what you ask me.

Q. Okay well, for right now what we have and why you're here, you're here because we're conducting a murder investigation alright and at this point you've been implicated as being involved in this thing. [W]e've talked to ... just about everybody that was involved in this thing ..., they've all been arrested. They all understand the seriousness of this investigation. They all don't

want no part of it .... They all basically point the finger at you.[1]

Garvey then answered Detective Brock's questions.

Before trial, Garvey filed a motion to suppress his statement in the Superior Court, arguing that his waiver was defective. In a September 2002 decision, the trial judge found that Garvey's response "merely indicated to police that he intended to choose which questions he intended to answer and what information he intended to share with police."[2] The trial judge therefore denied Garvey's motion. Following an October 2003 trial, a jury convicted Garvey of all charges.[3] On the jury's recommendation, the trial judge sentenced Garvey to life in prison.[4]

Garvey now appeals his conviction, the denial of his suppression motion, and other aspects of the trial. Specifically, Garvey claims that police violated his Fifth Amendment right to remain silent by failing to clarify an allegedly equivocal waiver. He also asserts that the trial judge abused his discretion by denying his motion for a mistrial based on the investigating officer's allegedly improper testimony. Finally, Garvey contends that an inconsistency between the jury's findings at the guilt and penalty phases compromised the integrity of the verdict and sentence. Garvey claims that this inconsistency denied him due process and a fair trial.

## II.

Garvey first claims that police violated his right to remain silent by failing to clarify an ambiguous waiver in his post-arrest statement. Garvey maintains that his statement—"depends on what you ask me"—was equivocal and thus required the detective to ask follow-up questions. Because Detective Brock failed to do so, instead opting to continue the interrogation, Garvey contends that the trial judge abused his discretion by denying his motion to suppress the post-arrest statement.

### A.

The self-incrimination immunities embedded in the Delaware and United States constitutions evolved from the British common-law principle that holds that coerced confessions are inherently untrustworthy.[5] Under the federal constitution, "no person ... shall be compelled in any criminal case to be a witness against himself ...."[6] This privilege against self-incrimination is the right of a person "to remain silent unless he chooses to speak in the unfettered exercise of his own will."[7] But because investigators exert "inherently compelling pressures" in the custodial

1. Wilm. Police Tr. at 3 (July 16, 2001) (interjections and expletive omitted).

2. *State v. Garvey*, 2002 WL 31111884, at *2, 2002 Del.Super. LEXIS 227, at *7.

3. *See State v. Garvey*, 2003 WL 23095685, 2003 Del.Super. LEXIS 407 (findings after penalty hearing).

4. *Id.*

5. *See, e.g., King v. Warickshall*, 1 Leach 262, 263–264, 168 Eng. Rep. 234, 235 (K.B.1783) ("A confession forced from the mind by the flattery of hope or by the torture of fear comes in so questionable a shape, when it is to be considered as evidence of guilt, that no credit ought to be given to it."). *See also* RANDY J. HOLLAND, THE DELAWARE STATE CONSTITUTION: A REFERENCE GUIDE 46 (2002).

6. U.S. CONST. amend. V. *See also* DEL. CONST. art. I, § 7 (providing that an accused "shall not be compelled to give evidence against himself").

7. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

interrogation context,[8] authorities must apprise criminal defendants of their Fifth Amendment rights before questioning them.[9] This constitutional stricture governs a statement's admissibility in both federal and state courts.[10]

█ Although we must "presume that a defendant did not waive his rights,"[11] a defendant may waive the right to remain silent, so long as it is done knowingly and voluntarily.[12] Based on both the Fifth Amendment's right against self-incrimination and the due process provisions of the Fourteenth Amendment,[13] the voluntariness inquiry is not based on form,[14] but on circumstances that indicate the waiver was the "product of a free and deliberate choice[,] rather than intimidation, coercion[,] or deception."[15] The State bears the burden of proving both a right to silence waiver[16] and the voluntariness of a confession.[17]

█ Under the Delaware Constitution, unlike its federal counterpart, "if a suspect attempts to invoke [his or her] Miranda rights during an interrogation, but does not do so unequivocally, the police must clarify the suspect's intention before continuing with the interrogation."[18] Ideally, waivers are obtained through express statements. But in reality, a simple "yes" or "no" answer is not always forthcoming. Because of the inherently persuasive nature of in-custody interrogation, suspects express themselves in a variety of ways.[19] Because under these circumstances the speaker's true intent is unknown, clarifying ambiguities is vital to safeguarding the

8. See, e.g., Thompson v. Keohane, 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

9. Miranda v. Arizona, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that warnings are "absolute prerequisite to interrogation"); see also DeJesus v. State, 655 A.2d 1180, 1189–90 (Del.1995) (same).

10. Dickerson v. United States, 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) ("Miranda and its progeny in this Court govern the admissibility of statements made during custodial interrogation in both state and federal courts.").

11. California v. Braeseke, 444 U.S. 1309, 1310, 100 S.Ct. 742, 62 L.Ed.2d 720 (1980).

12. Miranda, 384 U.S. at 462, 86 S.Ct. 1602 ("[I]t must be sufficient to establish that ... the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent...."); Dorbolo v. State, 405 A.2d 106, 108 (Del.1979). See also Missouri v. Seibert, —— U.S. ——, ——, 124 S.Ct. 2601, 2608, 159 L.Ed.2d 643 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility....") (no United States Reports pagination available).

13. See, e.g., Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (Fifth Amendment); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (Fourteenth Amendment).

14. North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

15. Norcross v. State, 816 A.2d 757, 762 (Del. 2003) (citation omitted).

16. Colorado v. Connelly, 479 U.S. 157, 169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

17. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

18. Norcross, 816 A.2d at 762. Cf. Davis v. United States, 512 U.S. 452, 461–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that follow-up questions, although "good police practice," not required).

19. See Crawford v. State, 580 A.2d 571, 577 (Del.1990) ("[A rule that] bars all statements simply because a suspect articulates, in the most tentative and general fashion, a desire to consult with counsel is too inflexible and ill serves the needs of reasonable police investigation."). See also Peter Tiersma, The Language of Silence, 48 RUTGERS L. REV. 1 (1995) (surveying expression by silence).

values embedded in the Fifth Amendment right to silence and the Sixth Amendment right to counsel. As one commentator noted in the context of a request for counsel:

> [A defendant's statements] could be the poorly phrased products of decisions to secure fifth or sixth amendment protection; they could also indicate incipient, indefinite desires for counsel, a reflection on the options, or a desire for clarification of the possibilities. Such queries or statements could reflect indecision, or ongoing mental processes that may or may not result in reliance on a constitutional safeguard, or an effort to buy time for a definitive decision. Although one can guess at the intent of such allusions to counsel, it is impossible to know the real meaning of any of them.[20]

Where a defendant unambiguously waives his or her right to silence, however, interrogating officers need not ask clarifying follow-up questions.[21]

■ Because a finding of ambiguity rests on the totality of the circumstances, an inquiry into whether a defendant has waived his or her constitutional rights must proceed on a case-by-case basis. Numerous jurisdictions have addressed a variety of defendant statements in the waiver context. Several federal courts, for example, have looked to the challenged assertion's indeterminacy and obliquity. Thus, "I might want to speak to a lawyer," [22] "Maybe I should talk to a lawyer," [23] and "That's all I know, and I don't have anything else to say" [24] all have been considered ambiguous statements. A defendant who gives contradictory answers to identical questions also has not unequivocally waived a constitutional right.[25] Even if these or similar statements are made voluntarily, each statement displays a measure of indecision on the part of the defendant that casts doubt on the validity of the interrogation process.[26]

■ Other federal courts, however, have encountered unambiguous statements. In particular, "I'll answer what I want," [27] "I think I want a lawyer before saying anything else," [28] and "I have nothing to say, I'm going to get the death penalty anyway" [29] all evinced the intent of the speak-

20. James J. Tomkovicz, *Standards for Invocation and Waiver of Counsel in Confession Contexts*, 71 Iowa L. Rev. 975, 1004 (1986).

21. *Ploof v. State*, 856 A.2d 539, 547 (Del.2004) ("[Ploof's] statement was not ambiguous and, therefore, the police were not required to seek further clarification of his intent before proceeding to question him.").

22. *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir.1985).

23. *Davis*, 512 U.S. at 462, 114 S.Ct. 2350 (first of two statements). *See also United States v. McGhee*, 2000 U.S. Dist. LEXIS 15066 (W.D.N.Y.) (holding "I suppose I need a lawyer" equivocal).

24. *United States v. Munoz–Elias*, 39 Fed.Appx. 598, 600 (9th Cir.2002) (paraphrased from original).

25. *United States v. Brown*, 287 F.3d 965 (10th Cir.2002).

26. *See DeJesus*, 655 A.2d at 1190 ("The now-familiar *Miranda* warnings were designed to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process."), *citing Miranda*, 384 U.S. at 469, 86 S.Ct. 1602 (quotation marks omitted). *But see James v. Marshall*, 322 F.3d 103, 109 (1st Cir.2003) (holding "nope" ambiguous).

27. *Brewer v. Yearwood*, 30 Fed.Appx. 713, 714 (9th Cir.2002).

28. *Davis*, 512 U.S. at 455, 114 S.Ct. 2350 (second statement).

29. *United States v. Bushyhead*, 270 F.3d 905, 912–13 (9th Cir.2001).

er and thus were found to be unambiguous. Whether suspects choose to waive or invoke their rights, statements that articulate a desire either way are unequivocal when, under the totality of the circumstances, the statement is unaccompanied by other factors that demonstrate indecision on the part of the accused.[30]

Recently, this Court has encountered several challenged statements. In *Norcross v. State*, we found that "I want to know what [the codefendant] said" was not an ambiguous invocation of the right to remain silent.[31] One year later, in *Ploof v. State*, we found that "I'll help you out as much as I can" was similarly unambiguous.[32] We have found, however, that a defendant's repeated and consistent requests to speak to his mother constituted an equivocal statement that required clarification.[33]

■■■■ Although Garvey raises a claim of constitutional dimensions, our standard of review is one of deference to the trial judge's factual findings.[34] We therefore review a trial judge's refusal to grant a motion to suppress evidence for abuse of discretion.[35] If the historical facts are properly established, "the issue is whether an undisputed rule of law is or is not violated."[36] Thus, to the extent an appeal from a motion to suppress implicates a

defendant's right to remain silent, our review is *de novo*.[37]

### B.

■■■ In his decision, the trial judge found that Garvey's statement "indicated to police that he intended to choose which questions he intended to answer and what information he intended to share with police."[38] Garvey asserts that because the trial judge had to interpret the intent behind Garvey's statement *ex post*, the statement was inherently ambiguous. He thus maintains that Detective Brock failed to ask clarifying questions before continuing the interrogation. On this record, according to Garvey, the trial judge abused his discretion by denying his motion to suppress the postarrest statement.

We disagree. The phrase "depends on what you ask me," even without any context, indicates a contingency of some sort. It implies that the speaker will decide whether he will or will not respond based on the conduct or speech of another. Through this prospective decisionmaking, the speaker necessarily must understand the import of the original request. Otherwise, the speaker could not have responded with the contingent phrase in the first place.

---

30. *Cf. Davis*, 512 U.S. at 459, 114 S.Ct. 2350 ("Although a suspect need not speak with the discrimination of an Oxford don, ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.") (citation and quotation marks omitted).

31. 816 A.2d 757, 763 (Del.2003).

32. 856 A.2d 539, 547 (Del.2004).

33. *Draper v. State*, 2002 Del. LEXIS 51.

34. *See Lopez v. State*, 861 A.2d 1245, 1248 (Del.2004) ("Findings of historical fact are

subject to the deferential 'clearly erroneous' standard of review."). *See also Woody v. State*, 765 A.2d 1257, 1261 (Del.2001).

35. *Purnell v. State*, 832 A.2d 714, 718 (Del. 2003); *Virdin v. State*, 780 A.2d 1024, 1030 (Del.2001).

36. *Lopez*, 861 A.2d at 1249.

37. *Id. See also Banther v. State*, 823 A.2d 467, 486 (Del.2003).

38. *Garvey*, 2002 WL 31111884, at *2, 2002 Del.Super. LEXIS 227, at *7.

In the custodial interrogation setting, this type of response to an investigating officer's *Miranda* inquiry demonstrates that the speaker heard and understood his rights. Otherwise, the speaker could not have expressed a desire to selectively answer the officer's questions. Garvey made his remarks in this context.

Just like the statements "I'll answer what I want" and "I have nothing to say," the response "depends on what you ask me" evidenced an intent by Garvey to follow a certain course of action in advance. This state of mind is bolstered by the surrounding circumstances. Garvey answered Detective Brock's questions and never stated he wished to stop doing so. Based on these circumstances, Garvey's statement constituted an unambiguous waiver of his *Miranda* rights that did not require further clarification. Accordingly, we find that the trial judge acted within his discretion by denying Garvey's suppression motion.

### III.

 In his second claim, Garvey maintains that the trial judge abused his discretion by denying his motion for a mistrial after Detective Brock, the chief investigating officer, testified that Garvey admitted knowledge of the robbery plans. Garvey claims Detective Brock impermissibly offered an opinion on Garvey's credibility and made an improper comment about a redacted portion of the transcript. Based on this testimony, Garvey claims that his

due process rights were violated and that he was denied a fair trial.

 We review the trial judge's denial of Garvey's motion for a mistrial for abuse of discretion.[39] In undertaking this process, we also consider the effectiveness of the trial judge's instruction to the jury to disregard Detective Brock's responses to cure any unfair prejudice.[40]

The State called Detective Brock to lay a foundation before offering Garvey's videotaped interview into evidence. Before admitting the videotape, the trial judge instructed the jury that they should not speculate about any redacted portions of the transcript. The trial judge then admitted the videotape. On cross-examination, defense counsel asked Detective Brock: "When you interviewed Mr. Garvey, [he] denied being aware of the robbery plans; is that fair to say?"[41] Detective Brock answered no. Defense counsel then asked Detective Brock to point to where in the transcript Garvey made a statement to the contrary. Detective Brock responded: "The transcript is a redacted version, so—."[42] The trial judge then immediately called a sidebar conference.

Outside the jury's presence, the trial judge permitted defense counsel to question Detective Brock to determine the location of Garvey's purported admission. According to Detective Brock, Garvey admitted to him that he thought that King and Vanderworker planned to rob him. Detective Brock, however, could not pinpoint where in the transcript Garvey made this statement. Because it was the end of

39. *Flowers v. State,* 858 A.2d 328, 332 (Del. 2004); *Taylor v. State,* 827 A.2d 24, 27 (Del. 2003); *Ashley v. State,* 798 A.2d 1019, 1022 (Del.2002).

40. *Sawyer v. State,* 634 A.2d 377, 380 (Del. 1993) (examining the "trial court's effort to mitigate the improper testimony" to ensure "any prejudice resulting from the improper" testimony was cured).

41. Tr. Trans. at 157 (October 15, 2003).

42. *Id.*

the trial day, the trial judge recessed the proceedings until the following morning.

On resuming questioning the next day, still outside the jury's presence, Detective Brock conceded that Garvey did not admit to being aware of any robbery plan. Detective Brock explained that he instead answered in the negative based on Garvey's statement, other investigative sources, and the fact that Detective Brock disbelieved Garvey's claim to being the target of a robbery. Garvey then moved for a mistrial. The trial judge denied the motion and brought the jury in. Once the jury reentered the courtroom, the trial judge instructed them to disregard Detective Brock's statement the day before about the redacted transcript and admonished them to avoid speculating about redacted portions of the videotape.

Detective Brock asserted that Garvey admitted having knowledge of the robbery during the course of questioning outside the presence of the jury. Even if Detective Brock's statements were false, however, it could not have unfairly prejudiced Garvey because the jury never heard this testimony. But in light of the trial judge's earlier limiting instruction, the record reflects that Detective Brock improperly commented on the redacted status of the videotape.

■ "[W]hen prejudicial evidence is admitted, its prompt excision followed by a cautionary instruction will usually preclude a finding of reversible error." [43] Here, the trial judge stopped Detective Brock's testimony before the jury and immediately called counsel to sidebar. Questioning continued through the following day outside the presence of the jury. The trial judge gave his curative instruction after the objection had been fully explored outside the jury's presence.

Although a significant amount of time elapsed between the improper statement the jury heard and the curative instruction they received, Garvey cannot point to how the passage of time, without more, unfairly prejudiced him in the eyes of the jury when the instruction itself was properly designed to cure any prejudice arising from Detective Brock's reference to the redacted portion of Garvey's statement. The delay was unavoidable, considering that questioning began outside the presence of the jury toward the end of the day and continued into the next. Where, as here, the record reflects that the trial judge issued an otherwise effective curative instruction, the temporal constraints of the trial schedule alone cannot give rise to a finding of unfair prejudice sufficient to deny Garvey a fair trial and to warrant reversal. On this record, we find no abuse of discretion.

## IV.

■ Finally, Garvey maintains that the jury's arguably inconsistent findings in the guilt and penalty phases violated his due process guarantees and denied him a fair trial. Despite convicting Garvey of first-degree murder, the jury failed, during the penalty phase, to find unanimously that he committed the murder for pecuniary gain. Garvey claims that this inconsistency merits reversal. Because Garvey failed to raise this claim before the trial judge, we review for plain error. [44]

After trial, the jury unanimously found Garvey guilty of first-degree murder, first-

43. *Sawyer v. State,* 634 A.2d 377, 380 (Del. 1993).

44. DEL. SUPR. CT. R. 8.

degree robbery, and first-degree attempted robbery. Under the indictment, the first-degree murder conviction was contingent on a finding that Garvey murdered another while committing first-degree robbery.[45] During the penalty phase of trial, the jury found, by an eight-to-four verdict, that Garvey committed the murder for pecuniary gain, a statutory aggravating factor that justifies imposing the death penalty. Ultimately, however, the jury found by a nine-to-three verdict that the aggravating factors did not outweigh the mitigating factors.

When supported by sufficient evidence, arguably inconsistent jury findings will not be disturbed if they are the product of jury lenity.[46] It is within the bounds of reason that the jurors, having just found Garvey guilty, were now uneasy about making a sentencing recommendation of death. Based on the severity of the potential punishment, any inconsistency between a finding of guilt and a recommendation that diminishes, rather than exacerbates, the penalty must be the product of jury lenity. Based on this record, Garvey can neither demonstrate how he was unfairly prejudiced by the lesser penalty, nor can he show how the jury's findings jeopardized the fairness or integrity of the trial process. Garvey also does not claim that the verdict itself is unsupported by the evidence. Accordingly, we find no plain error.

## V.

For these reasons, the judgment of the Superior Court is **AFFIRMED**.

---

45. The jury convicted and the trial judge sentenced Garvey under the first-degree murder statute in effect as of 2003, which, in relevant part, required the State to prove Garvey "cause[d] the death of another person in the course of and in furtherance of the commission or attempted commission of ... robbery in the first degree...." *See* 11 *Del. C.* § 636(a)(6) (2003), *repealed by* 74 Del. Laws, c. 246 (May 19, 2004) (current version at 11 *Del. C.* § 636(a)(2) (2005)).

46. *Whitfield v. State,* 867 A.2d 168, 174 (Del. 2004) ("This Court has recognized the phenomenon of jury lenity and has upheld convictions that are part of arguably logically inconsistent judgments of acquittal."). *See also Tilden v. State,* 513 A.2d 1302, 1306–07 (Del.1986), *citing United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).